UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and CHARLES WHOBREY, as trustee, <br><br> Plaintiffs, <br><br> v. <br><br> MCKESSON CORPORATION, <br><br> Defendant. | No. 23 CV 16770 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

An arbitrator ruled in McKesson Corporation's favor in calculating the company's withdrawal liability to the Central States, Southeast and Southwest Areas Pension Fund under the Employee Retirement Income Security Act. The parties dispute whether the arbitrator properly excluded post-2014 contribution rate increases in calculating McKesson's withdrawal liability payments. The Fund moves to vacate or, in the alternative, modify the arbitration award. McKesson moves to enforce in part and modify in part. For the reasons discussed below, the Fund's motion to vacate or modify is denied. McKesson's motion to enforce is granted, but its motion to modify the award to include attorneys' fees is denied.

**I.  Legal Standards**

A party may seek judicial review to "enforce, vacate, or modify" an arbitrator's award in a withdrawal-liability arbitration. 29 U.S.C. § 1401(b)(2). An arbitrator's findings of fact are presumed correct, "rebuttable only by a clear preponderance of

the evidence." 29 U.S.C. § 1401(c). An arbitrator's legal conclusions are reviewed de novo. *Trustees of Iron Workers Loc. 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208, 211 (7th Cir. 1989).

## II. Background

The parties jointly stipulated to facts in the underlying arbitration. [32-1].[1] McKesson was a contributing employer to the Fund. [32-1] at 2. In 2008, the Fund's actuary certified it to be in "critical status" under the Pension Protection Act, and the Fund adopted a rehabilitation plan. [32-1] at 4. A rehabilitation plan may require an employer to, among other things, increase its contributions for the plan to emerge from critical status. *See* 26 U.S.C. § 432(e). The Fund adopted a rehabilitation plan with a Primary Schedule increasing McKesson's contribution rate annually. [32-1] at 4; [32-2] (primary schedule of increases from 2014 to 2021). The plan did not change the Fund's existing annual benefit accrual rate of 1%.[2] [32-1] at 4.

McKesson withdrew from the Fund in 2021. [32-1] at 2–3. The Multiemployer Pension Plan Amendments to the Employee Retirement Income Security Act require an employer withdrawing from a covered plan to make withdrawal liability payments so that the burden of its employees' vested pension benefits does not shift to other employers in the plan. 29 U.S.C. § 1396; *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir. 1992). The Fund calculated McKesson's

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of filings.

[2] The benefit accrual formula provides that a participant's annual accrual benefit (for calendar year 2004 and subsequent years) is equal to 1% of all contributions made on their behalf. [34] at 7; [32-10] at 8.

withdrawal liability under 29 U.S.C. § 1399(c) to be a lump sum of $91,866,745.75 or 240 monthly payments of $119,750.34. [32-1] at 3; 29 U.S.C. § 1399(c)(1)(C)(i). The monthly payment calculation was based on the highest three-year average of contribution base units and the "highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years." 29 U.S.C. § 1399(c)(1)(C)(i)(II).

The parties dispute only the second part of the calculation—what contribution rate should be used as the highest contribution rate. The Multiemployer Pension Reform Act of 2014 amended ERISA and changed how the highest contribution rate is calculated: "Any increase in the contribution rate… required or made in order to enable the plan to meet the requirement of the… rehabilitation plan shall be disregarded… in determining the highest contribution rate." *See* 29 U.S.C. § 1085(g)(3)(A).

The Fund did not exclude post-2014 contribution rate increases and calculated McKesson's withdrawal liability using the highest contribution rate of $189.00 per week as of the Fund's withdrawal on November 21, 2021. [32-1] at 3. McKesson argues that the proper rate is $143.60 per week because the highest contribution rate is subject to the provision in § 1085(g)(3), which excludes any contribution rate increases after 2014 required by a rehabilitation plan. [32-1] at 3; [35] at 5. The Fund's calculation yields a monthly withdrawal liability payment of $119,750.34. [32-1] at 3. McKesson's calculation yields a monthly payment of $90,984.92. [32-1] at 4.

3

The arbitrator ruled in favor of McKesson. He found the language of the statute dispositive. [32-33] at 6. The Fund adopted a rehabilitation plan and McKesson's contributions complied with annual rate increases incorporated into the plan's primary schedule. [32-33] at 6. Because McKesson's post-2014 contribution rate increases were made (or deemed to be made) to meet requirements of a rehabilitation plan, § 1085(g)(3)(A) required those rate increases to be excluded from the withdrawal liability calculation. [32-33] at 6. The arbitrator recognized two exceptions to the statutory requirement of disregarding post-2014 contribution rate increases in calculating the highest contribution rate, but he determined that none of the exceptions in § 1085(g)(3)(B) applied. [32-33] at 7.

The arbitrator granted McKesson's request for half of the arbitration filing fee and for reimbursement of overpayments in a lump sum with interest. [32-33] at 10–11. He denied McKesson's request for attorneys' fees. [32-33] at 10–11. The arbitrator ordered the Fund to recalculate McKesson's withdrawal liability using the highest contribution rate of $143.60 per week and refund overpayments in a lump sum with interest. [32-33] at 12.

Both parties seek judicial review of the arbitrator's award. *See* 29 U.S.C. § 1401(b)(2). The Fund moves to vacate the arbitrator's award, or in the alternative, modify the award to include only the portion of the post-2014 contribution rate increases attributable to funding additional benefit accruals. [34]. McKesson moves to enforce the award in part; it moves to modify the award to include attorneys' fees. [35].

4

### III. Analysis

#### A. Withdrawal Liability Calculation

Section 1085(g) of ERISA requires certain adjustments to be excluded in calculating an employer's withdrawal liability. 29 U.S.C. § 1085(g) ("Adjustments disregarded in withdrawal liability determination"). For contribution increases required by a funding improvement or rehabilitation plan, the statute provides:

> (A) In general… Any increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded… in determining the highest contribution rate…
>
> (B) Special rules… For purposes of this paragraph, any increase in the contribution rate (or other increase in contribution requirements) shall be deemed to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan except for increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided or additional contributions are used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B).

29 U.S.C. §§ 1085(g)(3)(A)–(B). Subsection (g)(3)(A) provides the general rule—any contribution rate increases required as a part of a rehabilitation plan "shall be disregarded" in determining the highest contribution rate used in calculating withdrawal liability under § 1399(c). *See id.* § 1085(g)(3)(A). Subsection (g)(3)(B) states that any increase in contribution rate is deemed required or made to meet requirements of a rehabilitation plan (and therefore disregarded) unless one of two exceptions apply. *Id.* § 1085(g)(3)(B).

The parties stipulated that the Fund adopted a rehabilitation plan and that none of the contribution rate increases from 2014 to 2021 were due to increased levels

5

of work or employment. [32-1] at 5. So, the first exception does not apply. The second exception applies to additional contributions used to provide an increase in benefits or future benefit accruals "permitted by" subsections (d)(1)(B) (for funding improvement plans) or (f)(1)(B) (for rehabilitation plans). 29 U.S.C. § 1085(g)(3)(B). Because the Fund did not adopt a funding improvement plan, subsection (f)(1)(B) is the relevant exception. Subsection (f)(1) contains a general rule prohibiting amendment of a rehabilitation plan and an exception:

> (A) In general... A plan may not be amended after the date of the adoption of a rehabilitation plan... so as to be inconsistent with the rehabilitation plan.
>
> (B) Special rules for benefit increases... A plan may not be amended after the date of the adoption of a rehabilitation plan... so as to increase benefits, including future benefit accruals, unless the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan.

*Id.* §§ 1085(f)(1)(A)–(B). It's undisputed that the Fund did not adopt an amendment to the rehabilitation plan and that the Fund's actuary did not certify that benefit increases were paid out of additional contributions not contemplated by the original plan. [32-1] at 5.

Subsection (g)(3)(A) is broadly prohibitive—"*[a]ny* increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the... rehabilitation plan *shall be disregarded*" from the highest contribution rate calculation. 29 U.S.C. § 1085(g)(3)(A) (emphasis added); *see United States v. Gonzales,* 520 U.S. 1, 5 (1997)

6

("any" is naturally expansive unless modified by limiting language). The breadth of subsection (g)(3)(A) is limited only by the phrase "unless due to increased levels of work, employment, or periods for which compensation is provided." 29 U.S.C. § 1085(g)(3)(A). The first part of subsection (g)(3)(B) confirms the broad scope of (g)(3)(A)—"*any* increase in the contribution rate (or other increase in contribution requirements) *shall be deemed* to be required or made in order to enable the plan to meet the requirement of the… rehabilitation plan." *Id.* § 1085(g)(3)(B) (emphasis added).

The second part of subsection (g)(3)(B) narrows the scope of exclusion, but not by much. It provides for two exceptions where rate increases would not be excluded, i.e., rate increases that may be properly used in the withdrawal liability calculation. The first exception repeats the limitation found in subsection (g)(3)(A) for "increases in contribution requirements due to increased levels of work, employment, or periods for which compensation is provided." *Id.* The parties agree that this does not apply. [32-1] at 5. The second exception requires a plan amendment and actuarial certification that an increase was paid for by additional contributions not originally in the plan. The parties agree that the Fund never adopted a plan amendment certified by the actuary to increase benefits. [32-1] at 5. McKesson's post-2014 contribution rate increases (made in accordance with the rehabilitation plan's primary schedule) don't fall under subsection (g)(3)(B), so the general exclusion provision in (g)(3)(A) applies. Any post-2014 contribution rate increase may not be

7

used in calculating the highest contribution rate in the withdrawal liability calculation.

The Fund contends § 1085(g)(3)(A) should not be read as a blanket exclusion on contribution rate increases. It argues that the "permitted by" language in subsection (g)(3)(B) refers to a narrow prohibition in (f)(1)(B) for rate increases that are not made under an amendment to a rehabilitation plan certified by the plan's actuary. [34] at 9–10. In other words, subsection (f)(1)(B) shouldn't be interpreted as imposing requirements for the exception in subsection (g)(3)(B) to apply. [37] at 7. The Fund argues subsection (f)(1)(B) merely singles out a prohibited increase—one that lacks actuarial certification. Because the Fund's long-standing 1% benefit accrual formula isn't prohibited by subsection (f)(1)(B), it is "permitted by" it, so the argument goes. In the Fund's view, all post-2014 contribution rate increases should be included in calculating McKesson's withdrawal liability because the plan's 1% benefit accrual rate predates the rehabilitation plan. [37] at 13–14.

The Fund's interpretation ignores the language of the statute. The broad exclusion in subsection (g)(3)(A) applies *unless* a special rule in subsection (g)(3)(B) applies. Any rate increases not covered by those exceptions are subject to the general provision and must be excluded from the calculation. *See Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 605–06 (7th Cir. 2012) (interpreting exceptions to a statute's broad prohibition narrowly because "exceptions should not be read to eviscerate the rule they modify"); *Contreras-Bocanegra v. Holder*, 678 F.3d 811, 817 (10th Cir. 2012) ("As a general principle of statutory interpretation, if a statute specifies exceptions to its

8

general application, other exceptions not explicitly mentioned are excluded."). Because there was no plan amendment and actuarial certification, the exception in subsection (f)(1)(B) does not apply. The Fund says Congress could have used more restrictive language than "permitted by" if it intended "something narrower." [34] at 10–11 (citing language in § 1085(c)(5)(A)(i) that provides "paragraphs 3(B) and 4(B) shall apply only if the plan's actuary certifies…"). Under the Fund's view, the inquiry under subsection (g)(3)(B) should be whether "the rate increases were 'permitted by' § 1085(f)(1)(B)." [34] at 11. But the general exclusion in subsection (g)(3)(A) provides the restrictive language that the Fund argues is absent. And under subsection (g)(3)(B), any increases are deemed to be required by a rehabilitation plan except for increases permitted by (f)(1)(B). The subsection (f)(1)(B) exception requires actuarial certification. The post-2014 contribution rate increases (part of the rehabilitation plan's primary schedule and deemed necessary to the plan) are excluded from the calculation of withdrawal liability.

In support of its interpretation, the Fund draws a comparison to § 1085(g)(2), which applies to surcharges. 29 U.S.C. § 1085(g)(2); [34] at 11–12. The Fund says that subsection (g)(2) creates a blanket exclusion for surcharges (which can never be benefit bearing but only reduce underfunding) while subsection (g)(3) takes into account how contribution rate increases can result in benefit accruals while reducing underfunding. From this difference, the Fund gleans Congress's intent to exclude only non-benefit bearing contribution rate increases (i.e., increases reducing underfunding) from the withdrawal liability calculation. [34] at 11. In other words,

9

the Fund posits any benefit-bearing contribution rate increases may be included in the calculation. Because McKesson's post-2014 contribution rate increases were used to provide an "increase in benefits" under § 1085(g)(3)(B) and those increases are not prohibited by § 1085(f)(1)(B), the Fund says all post-2014 contribution rate increases should be included in the withdrawal liability calculation. [34] at 12. The Fund's logic rests on interpretations of the provisions rejected above, and more importantly, it reads in a distinction that isn't in the statute. When a statute's text is clear, the inquiry ends there. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017); *see, e.g., Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 460–61 (2002) (noting that a court need not entertain plausible explanations for why Congress wrote a statute imposing liability on some groups and not others when the statute is clear and unambiguous). Subsection (g)(3)(A) doesn't distinguish between benefit-bearing and non-benefit bearing contribution rate increases. It simply provides exceptions for certain benefit increases under plan amendments that meet actuarial-certification requirements.

For this reason, I also reject the Fund's alternative argument. The Fund says at minimum, the portion of McKesson's post-2014 contribution rate increases attributable to funding additional benefit increases (as opposed to increases made to correct underfunding) should be included in the withdrawal liability calculation. *See* [34] at 12–17.[3] Because all of McKesson's post-2014 contribution rate increases are

---

[3] The Fund argues that § 1085(e)(3)(A), which sets out "requirements" of a rehabilitation plan, supports the Fund's interpretation of § 1085(g)(3)(A). [34] at 13–14. Again, this argument relies on an interpretation of subsection (g)(3) as one that narrowly excludes only rate increases that reduce underfunding. But subsection (g)(3)(B) defines any contribution rate increases (which would include a preexisting benefit accrual rate) to be "deemed to be

10

excluded under § 1085(g)(3)(A) and none of the statutory exceptions apply, there is no basis to separate the Fund's preexisting 1% benefit accrual rate from the annual contribution rate increases required under the rehabilitation plan. The Fund relies on the Pension Benefit Guaranty Corporation's proposed rule that interpreted § 1085(g)(3) and provided simplified methods for calculating withdrawal liability. *See* 84 Fed. Reg. 2075 (Feb. 6, 2019). The proposed rule would have included a "benefit-bearing contribution increase, i.e., a contribution increase that funds an increase in benefits or accruals as an integral part of the plan's benefit formula" in the withdrawal liability calculation. 84 Fed. Reg. at 2082. And it would have required "the portion of the contribution increase… that is funding the increased future benefit accruals [to] be determined actuarially." *Id.* But the agency did not ultimately adopt the proposed rule. *See* 86 Fed. Reg. 1256, 1265 (Jan. 8, 2021) (noting that the final rule does not provide further interpretation of § 1085(g)(3) than what is provided in the statute). Because the language of § 1085(g)(3) does not distinguish between benefit-bearing and non-benefit bearing contribution rate increases, all of McKesson's post-2014 contribution rate increases are excluded.

The arbitrator properly ordered the Fund to recalculate McKesson's withdrawal liability using the highest contribution rate of $143.60, resulting in a monthly payment of $90,984.92. [32-33] at 11–12.

---

required or made in order to enable the plan to meet the requirement of the… rehabilitation plan." 29 U.S.C. § 1085(g)(3)(B). The Fund's preexisting 1% benefit accrual rate is necessarily defined as an excluded contribution rate increase under subsection (g)(3)(A) even if it does not correct underfunding.

B.  **Overpayments**

The arbitrator ordered the Fund to refund overpayments to McKesson in a lump-sum payment with interest. [32-33] at 11. The arbitrator found 29 C.F.R. § 4219.31 to be controlling:

> If [the arbitrator] determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, with interest, in a lump sum.

29 C.F.R. § 4219.31(d). The Fund argues that the arbitrator ignored the statutory text of 29 U.S.C. § 1401(d), and a different regulation, 29 C.F.R. § 4221.8(a)(2), which provides the arbitrator the option of providing a credit against future withdrawal liability payments rather than a lump-sum refund. [37] at 16. But 29 U.S.C. § 1401(d) only explains an employer's obligation to make payments pending an arbitrator's final decision, subject to adjustments for overpayments or underpayments in accordance with the decision; it makes no mention of what form an overpayment refund must take. 29 U.S.C. § 1401(d). And the regulation in 29 C.F.R. § 4221.8(a)(2) explicitly references the provision cited by the arbitrator:

> The arbitrator shall render a written award that… [a]djusts (or provides a method for adjusting) the amount or schedule of payments to be made after the award to reflect overpayments or underpayments made before the award was rendered *or requires the plan sponsor to refund overpayments in accordance with § 4219.31(d)*.

29 C.F.R. § 4221.8(a)(2) (emphasis added). The Fund says a credit against future payments would align with the statute's purpose of protecting a fund against the risk of insolvency. [37] at 16–17. Because the regulation cited by the arbitrator clearly states the "plan sponsor *shall* refund the overpayment, with interest, in a lump sum,"

12

there's no need to consider whether permitting reimbursement in the form of a credit would be more consistent with statutory purpose. 29 C.F.R. § 4219.31(d) (emphasis added). The arbitrator appropriately ordered a lump-sum refund payment with interest to McKesson under 29 C.F.R. § 4219.31(d). The Fund's motion to modify the award is denied.

### C. Attorneys' Fees

An arbitrator may require a party initiating or contesting an arbitration to pay attorneys' fees if their conduct is in bad faith. 29 C.F.R § 4221.10 (listing other grounds). An arbitrator's decision to award attorneys' fees under § 4221.10 is reviewed for abuse of discretion. *See Trustees of Utah Carpenters' & Cement Masons' Pension Tr. v. Loveridge*, 567 Fed. App'x 659, 662 (10th Cir. 2014). The arbitrator's decision is affirmed if "it has a basis in reason" and reversed only upon "an erroneous conclusion of law, a record that contains no evidence rationally supporting the [arbitrator's] decision, or facts that are clearly erroneous as the [arbitrator] found them." *LHO Chicago River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 967 (7th Cir. 2021) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 779 (7th Cir. 2010)).

The arbitrator denied McKesson's request for attorneys' fees because the Fund's defense was not frivolous. [32-33] at 10. While a string of prior arbitration rulings weighed against the Fund, the arbitrator noted the absence of controlling federal case law on the statutory interpretation question. [32-33] at 11. McKesson argues that the Fund's continued reliance on a rejected statutory argument that lacks

13

textual support satisfies the bad-faith standard. It points out that two arbitration rulings in the Fund's favor were vacated by the district court's decision in *Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.,* No. 22-CV-06133, 2024 WL 1363542 (N.D. Ill. Mar. 29, 2024).[4] [35] at 14–15. But the arbitrator issued his ruling before the *Event Media* or *Royal Ice Cream* decisions, so his determination that the Fund's defense was not foreclosed by settled law didn't amount to legal error. The arbitrator did not abuse his discretion by finding the Fund's conduct did not amount to bad faith.[5] McKesson's motion to modify the award to include attorneys' fees is denied.

## IV.    Conclusion

The Fund's motion to vacate or modify the arbitration award, [33], is denied. McKesson's motion to enforce the award is granted, but its motion to modify the

---

[4] Since the arbitrator's ruling on November 14, 2023, [32-33], two courts in this district have interpreted the statutory provisions and found that post-2014 contribution rate increases must be disregarded in calculating withdrawal liability. *See Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.,* No. 22-CV-06133, 2024 WL 1363542 (N.D. Ill. Mar. 29, 2024) *and Royal Ice Cream Co. v. Cent. States, Se. & Sw. Areas Pension Fund,* 732 F.Supp.3d 888 (N.D. Ill. 2024).

[5] McKesson seems to suggest the arbitrator erred by considering frivolous conduct rather than bad faith conduct. *See* [35] at 15 ("Frivolous conduct, however, is not required; bad faith conduct is."). But bad faith conduct includes making frivolous claims. *Cf. Perfection Bakeries, Inc. v. Chauffeurs, Teamsters & Helpers, Loc. Union No. 414*, 105 Fed. App'x 102, 105 (7th Cir. 2004) ("[T]he existence of controlling precedent contrary to a litigant's position may be a sign that the litigant's challenge to a labor-arbitration decision is frivolous or brought in bad faith."); *Egan v. Pineda*, 808 F.3d 1180, 1180 (7th Cir. 2015) (bad faith can include "recklessly making a frivolous claim"). The arbitrator did not misapply the legal standard under 29 C.F.R § 4221.10 by assessing whether the Fund's defense was frivolous in light of existing precedent.

14

award to include attorneys' fees is denied. Enter judgment in favor of defendants, affirming the arbitration award in its entirety. Terminate civil case.

ENTER:

                                                                Manish S. Shah
                                                             United States District Judge

Date: January 13, 2025